# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBBIE J. PONDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:07-0789 |
| | ) | Judge Echols |
| THE MARTIN-BROWER COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is a diversity action in which Plaintiff, Robbie J. Ponder ("Ponder") alleges that her former employer, The Martin-Brower Company, LLC ("Martin-Brower"), discriminated and retaliated against her in violation of the Tennessee Human Rights Act, § 4-21-101, et seq. Pending before the Court is Defendant's Motion for Summary Judgment (Docket Entry No. 19), to which Plaintiff has responded in opposition (Docket Entry No. 27) and Defendant has replied (Docket Entry No. 31).

## I. FACTUAL BACKGROUND[1]

Martin-Brower is a logistics provider and distributor for McDonald's Restaurants in the United States, Canada, and various Latin American countries. One of its facilities is located in Dickson, Tennessee. From this facility, Martin-Brower distributes products to McDonald's restaurants in several southeastern states. Martin-Brower maintains a policy prohibiting all forms of discrimination and harassment and has a complaint reporting procedure for incidents of alleged

---

[1]The recitation of facts is derived from Defendant's Statement of Material Facts and Plaintiff's responses thereto.

1

discrimination and harassment which is published in the employee handbook and distributed to all employees.

Plaintiff became employed by Martin-Brower as a Maintenance Tech on October 13, 2004. In that position, Plaintiff was responsible for performing routine and preventative maintenance on equipment, cleaning the facility, coordinating compliance with customer audit requirements for maintenance-related tasks, and performing other maintenance-related jobs as needed. Plaintiff was an "at-will" employee. Her status as an "at-will" employee was explicitly stated on her employment application and in the employee handbook received by Plaintiff.

Plaintiff remained employed as a Maintenance Tech until June 12, 2007. Martin-Brower asserts her position, along with the facility's entire maintenance department, was eliminated on that date.

The Warehouse Manager has supervisory authority over warehouse and maintenance operations at Martin-Brower's Dickson facility. From the time of Plaintiff's hire until January 2006, the Warehouse Manager was Jamey Luster ("Luster"). Thereafter, until the time of Plaintiff's termination, the Warehouse Manager was Steve Gianakos ("Gianakos").

Maintenance Techs, such as Plaintiff, were under the direct supervision of the Maintenance Lead whose job duties included servicing high voltage equipment and refrigeration units and overseeing the facility's maintenance operations.[2] Until some point in mid-2005, Dale Bailey ("Bailey") was the Maintenance Lead. Thereafter, Maurice Estes ("Estes") became the Maintenance Lead and held the position until the end of 2005. On May 25, 2006, Jeremy Jones ("Jones") became

---

[2]Because of the increased responsibilities, a Warehouse Lead received a higher hourly wage than a Maintenance Tech.

2

the Maintenance Lead and held that position until the maintenance department was allegedly eliminated in July 2007.[3]

Despite being a "direct report" of the Maintenance Lead, Plaintiff claims that most of the time a Maintenance Lead was not on the jobsite and she would therefore report directly to Luster or Gianakos. When the Maintenance Lead was absent, Plaintiff claims she would have to contact contractors to service the high voltage equipment and maintenance units. Plaintiff also alleges that even when Jones was at the facility, she often reported directly to Gianakos.

There was one other employee, Terry Ellingham ("Ellingham"), who also worked as a Maintenance Tech during Plaintiff's employment at Martin-Brower. Ellingham worked as a Maintenance Tech until April 2006 when he applied for, but did not receive, the Maintenance Lead position into which Jones was hired. After Ellingham left the employ of Martin-Brower, Plaintiff was the only employee holding a Maintenance Tech position.

Throughout Plaintiff's employment, Martin-Brower utilized outside contractors to supplement its maintenance staff. Temporary employees from Personnel Management, Inc. performed light maintenance and cleaning work, while United Mechanical and Electrical employees completed preventative maintenance and repairs on refrigeration equipment. Personnel from Garrison Toyota Material Handling serviced forklifts and jacks.

During her employment, Plaintiff had no problems with Luster, Bailey, Estes, or Ellingham regarding any alleged discrimination or harassment. On one occasion, Bailey told Plaintiff that she was hired to be his "arms, legs, and back," but Plaintiff complained to Luster, and the issue was

---

[3]It is unclear from the record whether anyone acted as a temporary Maintenance Lead between the end of Estes' term as Maintenance Lead and Jones' assumption of that position.

3

promptly resolved to her satisfaction. At least until early 2006, Plaintiff also had no issues regarding discrimination with Gianakos.

On March 28, 2006, Gianakos sent an e-mail to Plaintiff and three Warehouse Lead employees, requesting that they attend a training session for certification as forklift drivers. (Pl. Dep. 232, Pl. Dep. Ex. 26.) Plaintiff attended the training session with the Warehouse Leads, was paid for the time spent in training, and received the certification.

Sometime in late August or early September 2006, Plaintiff claims Jones told her he wished Martin-Brower would hire a man to assist him with maintenance work and have Plaintiff complete paperwork. Jones allegedly made this statement in the maintenance office. Plaintiff complained about Jones' alleged statement to Gianakos and Luther C. Tanley ("Tanley"), the Human Resources Manager at Martin-Brower's Dickson, Tennessee facility. After receiving her complaint, Tanley claims he investigated the matter by interviewing Jones to determine whether he had actually made the comment to Plaintiff. Jones denied doing so. Tanley reminded Jones of Martin-Brower's policy against discrimination and harassment and that such comments were unacceptable.

Plaintiff did not mention her concerns about Jones' alleged comment to anyone at Martin-Brower's corporate office. She claims that she did not do so because she was told by Wendy Egli ("Egli"), the General Manager, that she (Egli) was going to take care of the matter.

At around the same time as Jones' alleged comment, Plaintiff complained to Gianakos that she and Jones were not effectively communicating. She claimed that, as a result, job duties were not being properly distributed. Plaintiff also said Jones was not qualified to be the Maintenance Lead. Jones told Gianakos that his role was unclear, and he did not know whether he could ask Plaintiff to complete maintenance tasks. To address any issues regarding the distribution of work,

4

Gianakos required both Jones and Plaintiff to write their daily tasks in a log book for Gianakos' review.

Sometime during November or December 2006, Plaintiff and Jones disagreed about who was supposed to direct the temporary employees. Plaintiff claims after she directed the temporary employees to perform a certain job, Jones would then tell them to do something else. Jones reminded Plaintiff that he was in charge of the maintenance operations and that work assignments for the temporary employees should go through him.

Because of the concerns raised by Plaintiff about Jones' job performance, Egli, Tanley and Gianakos met with her on January 9, 2007 to listen to any issues that she might have. During that meeting, Plaintiff claimed that Jones did not communicate well with her and became easily offended, that Jones did not complete the duties he was assigned to do, and that Gianakos favored Jones.

To support her favoritism claim, Plaintiff said Jones did not complete his assigned tasks and that Gianakos allowed him to get away with it. As an example, Plaintiff stated that Jones did not complete any maintenance paperwork. She also claimed Gianakos did not send e-mails directly to her, but later admitted that was not favoritism because Jones was the Maintenance Lead.

At the meeting, Plaintiff also stated she knew more than Jones in regard to "leadership" and completing paperwork. Plaintiff also alleged that Jones falsely claimed to have completed work by recording tasks in the log book that he did not do.[4]

After meeting on January 9, 2007, Egli, Tanley and Gianakos determined that there was confusion about the tasks that Plaintiff and Jones were supposed to perform. Accordingly, Egli

---

[4]Plaintiff's statements about Jones' performance were not made solely to management. Plaintiff told fellow co-workers about Jones' inability to properly do his job and criticized Jones' work performance in front of many employees at the warehouse.

directed Tanley and Gianakos to draft job descriptions for both Plaintiff and Jones so that each would be clear about his or her respective duties. Both Plaintiff and Jones reviewed and signed the job descriptions for their respective positions. Plaintiff met with Tanley and Gianakos on January 16, 2007 to discuss her job description and acknowledged that her job description was correct.

Egli, Tanley and Gianakos also discussed Plaintiff's issues with Jones' job performance, and agreed to monitor the situation. To create a final summary of the issues that Plaintiff raised during the January 9, 2007 meeting and explain the measures that management planned to take to address them, Tanley drafted a memorandum that he, Egli, Gianakos and Plaintiff signed. Plaintiff had an opportunity to correct anything she believed to be a misstatement, and in fact, changed and initialed two bullet points before she signed the document.

During this same period, Plaintiff claimed she did not receive holiday pay for January 1, 2007 after she took a personal day on January 2, 2007. Holiday pay was initially denied because Martin-Brower maintains a policy requiring employees to work their scheduled shifts immediately before and after a holiday to receive holiday pay. After Plaintiff complained to Tanley, it was determined that Plaintiff should have in fact received holiday pay and she received her holiday pay for January 1, 2007, shortly after she complained.

At around 3:00 a.m. on February 12, 2007, about three hours before Plaintiff's scheduled start time, Plaintiff was called into the facility to assist with broken sprinklers. The next day, Plaintiff asked Gianakos how she would be compensated for her early arrival. Gianakos told her she would be paid as though she arrived three hours early to work. This calculation was beneficial to Plaintiff because she received overtime pay for roughly three hours at time-and-a-half, instead of

6

four straight time hours at regular pay. Plaintiff nevertheless claims she was treated differently than other employees.

From late December 2006 until March 31, 2007, Plaintiff was certified to take intermittent leave under the Family and Medical Leave Act ("FMLA") to care for her son who had injured his knee. As the FMLA requires, Plaintiff provided Egli and Tanley with a list of days she needed to be away from work to care for her son.

On March 29, 2007, Plaintiff was absent from work, although it was not one of the days she had listed as needed to care for her son under the FMLA. Plaintiff claims she told a Warehouse Lead she was taking the day off and that Human Resources had approved her being absent that day. Martin-Brower claims that Warehouse Leads have no authority to allow leave and Plaintiff was not otherwise approved to take leave. Regardless, because Plaintiff did not notify her supervisor that she would be absent, she was told that the leave would have to be taken as personal leave and she would be docked one day of personal leave time. After Plaintiff complained, Tanley restored the workday that was deducted from Plaintiff's personal leave balance.

On May 23, 2007, Plaintiff went outside the facility to the parking lot and began assisting a driver who was taping and painting lines on the pavement. The driver had been assigned this task as "light duty" while he was recuperating from an injury. Egli and Gianakos observed Plaintiff assisting the injured driver and Gianakos told Plaintiff the work was light duty and assigned to an injured employee. Plaintiff was told to go back to work inside. Plaintiff did so.

Later that same afternoon, Plaintiff spoke to Egli about being asked to stop assisting the driver with painting lines in the parking lot. During the conversation, Plaintiff claimed Gianakos was showing favoritism toward Jones because, while she was outside helping the driver, Jones was

7

also outside replacing a sign.  She claimed since Jones was working outside, she should also have been assigned to work outside.  Plaintiff also asserted that Gianakos did not say "good morning" to her. Plaintiff also stated that other warehouse employees thought Jones was unreliable.

Egli explained to Plaintiff that the driver was on light duty, and that the job painting lines was designed to give him some hours so he could get paid.  Egli further stated that she and Gianakos agreed Plaintiff's time was better spent completing other work.

Egli informed Plaintiff she knew Plaintiff was spreading gossip about Jones, telling other employees that Jones was not qualified to hold the maintenance position, and otherwise attempting to create a negative perception of Jones.  Plaintiff admitted voicing her opinions about Jones' job performance to other employees[5] and apologized for doing so.

Egli asked Plaintiff to stop spreading rumors about Jones, and also asked Plaintiff to stop repeating her opinions about Jones' abilities to other employees. Plaintiff agreed to stop such behavior.  Egli also told Plaintiff that management would conduct interviews to investigate Plaintiff's comments about problems that other employees might have with Jones' job performance.

The following week, Egli and Tanley spoke with five warehouse employees who frequently worked with the maintenance department.  According to both Egli and Tanley, those interviewed claimed that both Plaintiff and Jones failed to complete many tasks and attributed that to their poor working relationship.

On June 5, 2007, Jones asked Plaintiff to help him with welding.  This led to an argument during which Jones swore at Plaintiff.  Later that day, Plaintiff complained to Tanley.  During their

_____

[5]During her deposition in this case, Plaintiff admitted she told other employees Jones was "lazy," and that he did not do a lot of maintenance work or maintenance paperwork.

8

conversation, Tanley told Plaintiff he was "sick and tired" of hearing about disagreements between Plaintiff and Jones.

After meeting with Plaintiff, Tanley interviewed Jones to get his side of the story. Jones told Tanley the argument arose because Plaintiff refused to assist him. Jones also stated he knew Plaintiff was badmouthing him and trying to get him fired.

Tanley consulted with Egli to determine how to handle the continuing issues in the maintenance department. During their discussion, Tanley and Egli agreed that during the year Plaintiff and Jones worked together, the quality of work done by the maintenance department had deteriorated, there were delays in the completion of maintenance tasks, and the frequency of outsourcing to contractors (who did better work than Jones and Plaintiff) increased. They also agreed the dysfunctional relationship between Plaintiff and Jones created divisiveness among the workforce and was time-consuming for management. After consulting Martin-Brower's corporate office, Egli ultimately decided to eliminate the maintenance department at Martin Brower's Dickson facility and outsource all maintenance work to the contractors who had already been performing much of the work that Plaintiff and Jones did not complete.

Jones was informed on June 8, 2007 of Martin-Brower's decision to eliminate the maintenance department, and was laid off effective immediately. Plaintiff was informed of the decision on June 12, 2007, and was laid off that day. Both Jones and Plaintiff were offered severance packages. Tanley told Plaintiff that, because of the poor working relationship between her and Jones and the resulting substandard service, Martin-Brower decided to take the Dickson maintenance operation in a different direction that did not include Plaintiff. Plaintiff blamed Gianakos for her layoff and told him that he was not a Christian.

9

Following elimination of its maintenance department, Martin-Brower contracted with Personnel Management, Inc., United Mechanical and Electrical, and Garrison Toyota Material Handling to perform the maintenance functions at Martin-Brower's Dickson facility.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

10

### III.  APPLICATION OF LAW

As indicated at the outset, Plaintiff brings her claims of discrimination and retaliation under the THRA.  "The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims."  Bailey v. USF Holland, Inc., 526 F.3d 880, 885 n.1 (6th Cir. 2008)(citing, Campbell v. Florida Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996)).

### A. Discrimination Claim

A claim of discrimination may be established either by the introduction of direct evidence of discrimination, or by circumstantial evidence from which an inference of discrimination may be drawn.  Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003).

#### 1.  *Direct Evidence*

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.2d 921, 926 (6th Cir. 1999).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  Johnson, 319 F.3d at 865.  Moreover, "[i]t is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination."  Weigel v. Baptist Hosp. Of East Tennessee, 302 F.3d 367, 382 (6th Cir. 2002).

In this case, the only arguably direct evidence of discrimination is Jones' alleged statement he wished Martin-Brower would hire a man to assist him with maintenance work and have Plaintiff

11

complete paperwork and Tanley's statement that he was "sick and tired" of hearing about disagreements between Plaintiff and Jones.

The latter statement is clearly not direct evidence because it requires an inference to be drawn in order to prove the existence of a fact (i.e. unlawful discrimination). Kocak v. Community Health Partners of Ohio, Inc., 400 F.3d 466, 470-71 (6th Cir. 2005); Vredevelt v. GEO Group, Inc., 2005 WL 1869607 *5 (6th Cir. 2005). Tanley's statement about being sick and tired of Jones and Plaintiff does not in itself show discriminatory animus since the statement reflected disenchantment and frustration relating to the relationship of a male and female subordinate. See, Kidd v. Airborne Express, Inc., 2005 WL 3527151 at **4-5 (M.D. Tenn. 2005)(no direct evidence of discrimination where white supervisor told black employee "I am tired of dealing with 'you people," since the statement could have referred as well to other employees and contractors who were not black).

Jones' alleged statement about wanting a man working in the maintenance department while Plaintiff filled out paperwork is not necessarily direct evidence of discrimination. Recall that one of Plaintiff's many complaints was that Jones failed to complete paperwork. When that complaint is considered, Jones' statement could be understood as wishing that Plaintiff completed paperwork while another employee did maintenance work.

Regardless, Jones' statement is not sufficient to carry the day and present a jury issue on Plaintiff's discrimination claim for at least three reasons. First, Jones was not an ultimate decision maker, and Plaintiff has not offered any evidence Jones was involved in any adverse employment actions regarding Plaintiff. After all, the ultimate adverse action, to wit, Plaintiff's loss of a job, also affected Jones since he, too, was terminated. See, Hussain v. Highgate Hotels, 126 Fed. Appx. 256, 262 (6th Cir. 2002)(direct evidence is used to show "that the person who made the challenged

12

decision, or was otherwise meaningfully involved in that decision, had a bias or that bias affected the challenged decision").

Second, Jones allegedly made the statement in August or September 2006, but Plaintiff was not terminated until almost a whole year later.   See, Das v. Ohio State Univ., 57 Fed.Appx. 675, 678-79 (6th Cir. 2003)("Merely vague, ambiguous, or isolated remarks by a company agent which were not related to the decision-making process and were not made proximate to the assailed adverse employment action cannot constitute sufficient direct evidence of outlawed employment discrimination").  Further, immediately upon being informed of the alleged statement Tanley, the facility's Human Resources Manager, questioned Jones about the statement and counseled him about the inappropriateness of such statement, even though Jones denied making the same.

Third, even if a Plaintiff presents "'direct evidence of discriminatory motive, the burden of production and persuasion shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'"  DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004).  Here, as will become clear in the next section relating to circumstantial evidence, Martin-Brower has established by a preponderance of the evidence that it would have made the same employment decisions regarding Plaintiff, notwithstanding either Tanley's or Jones' alleged statements.

### 2. *Circumstantial Evidence*

To establish a circumstantial evidence case under the THRA, Plaintiff must initially establish a *prima facie* case of discrimination by showing (1) she is a member of a protected class, (2) she was qualified for the position she held, (3) she suffered an adverse employment action, and (4) she was replaced, or treated less favorably, by one outside the protected class.  See, Grace v. USCAR, 521

13

F.3d 655, 677 (6th Cir. 2008)(sex discrimination under Title VII); <u>Frye v. St. Thomas Health Serv.</u>, 227 S.W.3d 595, 610 (Tenn. Ct. App. 2007)(age discrimination under THRA). If a *prima facie* case is established, the burden shifts to the Defendant to offer a legitimate non-discriminatory reason for the employment action. <u>Id</u>. If the Defendant meets this burden, then the burden of production shifts back to the Plaintiff to demonstrate that the proffered reason is a pretext. <u>Id</u>.

In this case, Plaintiff points to assorted events which occurred during her employment as support for her claim of discrimination. For the most part, these events do not establish a *prima facie* case, and, in any event, Martin-Brower has offered legitimate non-discriminatory reasons for its actions which Plaintiff has not shown to be pretextual.

Plaintiff alleges discrimination because she was not promoted to the position of Maintenance Lead which was instead awarded to Jones. This does not support a claim of discrimination because it is untimely.

By statute, claims under the THRA must be filed within one year after the alleged discriminatory practice ceases." T.C.A. § 4-21-311(d).[6] A discriminatory act ceases when the "act ha[s] a degree of permanence which should trigger [the employee's awareness of and duty to assert his or her rights." <u>Booker v. The Boeing Co.</u>, 188 S.W.3d 639, 647 (Tenn. 2006)(internal citation marks omitted).

In this case, Plaintiff filed suit on July 30, 2007. Martin-Brower asserts Jones began as the Maintenance Lead on May 24, 2006 and cites as support for that contention Tanley's affidavit. In response, Plaintiff cites her own Affidavit for the proposition that Jones did not become the

---

[6]This period continues to run, even during the pendency of any administrative proceedings. <u>See</u>, <u>Durden v. Greater Dickson Gas Auth.</u>, 2006 WL 2670965 at *4 (M.D. Tenn. 2006).

Maintenance Lead until July 2007. (Docket Entry No. 27 at 5). However, Plaintiff's Affidavit says no such thing and does not contain any statement as to when Jones became the Maintenance Lead. Even if that assertion was contained in her Affidavit, Plaintiff admitted in her response to Martin-Brower's statement of facts that Jones was hired on May 26, 2006. Moreover, in her deposition, Plaintiff specficially stated that she did not know the exact date that Jones began working and could recall only that it "was in the summer sometime." (Pf. Depo. at 65). A party cannot create a factual issue by filing an affidavit after a motion for summary judgment has been made that directly contradicts his or her earlier testimony. Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986). Given the state of the record, the only competent evidence is that Jones began working as a Maintenance Lead on May 26, 2006.

Even if Plaintiff's claim were timely, Plaintiff fails to establish a *prima facie* case with respect to the Maintenance Lead position because she wholly fails to show that she and Jones were similarly situated. In her summary judgment papers, Plaintiff offers absolutely nothing from which this Court can discern her and Jones' respective training, education and ability, or other qualifications which should have been taken into consideration regarding the Maintenance Lead position.

Plaintiff claims she suffered a materially adverse action when there was a delay in her receiving pay after she took a personal day off after the January 1, 2006 holiday and when she took FMLA leave on one occasion. This is not properly the basis for a claim of sex discrimination (as

15

opposed to retaliation which will be discussed in the next section) since there is absolutely no evidence that any male employee in a similar situation was treated differently.[7]

Plaintiff also claims discrimination in light of her disagreements with Jones and her perception that Gianakos favored Jones. Anti-discrimination statutes were not enacted to enforce a civil code or eliminate slights and annoyances in the workplace. See, Burlington Northern & Sante Fe Ry. Co. v. White, 125 S.Ct. 2405, 2415 (2006).

The record suggests that Jones and Plaintiff bickered and that harsh words were exchanged. However, this does not establish a materially adverse action. Michael v. Caterpillar Finan. Serv. Corp., 496 F.3d 584, 594 (6th Cir. 2007). Maybe, as Plaintiff claims, Gianakos did not say "good morning" to her on one occasion, but a lack of good manners does not show discrimination. Id. Maybe Gianakos liked Jones more than Plaintiff and treated him better because of it, but favoritism is not evidence of impermissible discrimination. Quinn-Hunt v. Bennett Enter., Inc., 211 Fed Appx. 452, 458 (6th Cir. 2006). However dysfunctional the relationship may have been between Jones and Plaintiff (or Gianakos and Plaintiff for that matter), Plaintiff has not offered a shred of evidence which would suggest that Plaintiff's sex was a factor in her treatment.

In her Memorandum in opposition to the Motion for Summary Judgment, Plaintiff makes a vague argument about certification and training of forklift drivers. Plaintiff claims that training became mandatory only after she complained and cites her Affidavit as support for that contention.

---

[7]In her Memorandum, Plaintiff cites her Affidavit for the proposition that "Daniel Maynard did not receive any admonition from the Defendant at all" (Docket Entry No. 27 at 7) for taking a personal day after a holiday. Her Affidavit makes no such statement and does not even address the issue. Further, the evidence shows that Daniel Maynard was a Warehouse Lead and the Court is not informed as to whether Plaintiff and he had the same supervisors. Regardless, the Court has no evidence as to whether Daniel Maynard did in fact take a personal day after a holiday, let alone what the circumstances may have been which required him to take such a day off.

16

Again, however, her Affidavit says no such thing. The only evidence before the Court is that Gianakos invited several employees (including Plaintiff) to forklift training and Plaintiff was paid for that time. There is no evidence that she was in any way treated differently from anyone else.

In her Memorandum which again cites her Affidavit, Plaintiff claims that Travis Allison, Daniel Maynard, and James Huffstuttler were treated differently than her with regard to training others to operate a forklift. Her Affidavit makes no mention of these individuals and forklift training. The only evidence before the Court is that these three employees were Warehouse Leads who had a different pay structure than Maintenance Techs, and who had different job responsibilities and duties.

Finally, Plaintiff claims her termination constituted a discriminatory act. This argument is impossible to reconcile with the undisputed fact that Jones, the only other maintenance employee, was let go at the same time as Plaintiff. Both were treated the same. Both were terminated and received severance pay.

Even if it could be said that Plaintiff has established a *prima facie* case of sex discrimination, as the foregoing discussion shows, Martin-Brower has provided legitimate non-discriminatory reasons for its actions regarding Plaintiff. Accordingly, the burden shifts to Plaintiff to show pretext.

In her Memorandum, Plaintiff appears to be suggesting that Martin-Brower's assertion that it outsourced the maintenance department is pretext because a "temporary worker by the name of Tony Capps" continued to perform her duties. (Pf. Aff. ¶ 4). She also claims that "there was not an elimination of anyone except me." (Id.)

This latter statement is certainly not true as the undisputed evidence shows Jones was terminated at the same time as Plaintiff. That Tony Capps may have continued work at the facility

17

does not mean that he was an employee of Martin-Brower, either before the elimination of the maintenance department or after. Both Tanley and Egli have submitted affidavits in which they state that after the elimination of the maintenance department, Martin-Brower contracted with Personnel Management, Inc., United Mechanical and Electrical, and Toyota Material Handling to perform the maintenance functions at the Dickson facility and that Plaintiff and Jones have not been replaced. Moreover, Egli states Tony Capps is an employee of Personnel Management who did not even begin working at the Dickson facility until more than a month after Plaintiff and Jones were terminated.

The record shows Martin-Brower made an informed choice to eliminate the maintenance department because of the strife between Plaintiff and Jones and because outside contractors were performing the work better than Plaintiff and Jones. "An employer is only required to have a good faith belief, formulated through a reasonable reliance on particular facts, for its employment decision." Williams v. Columbus Met. Housing Auth., 90 Fed. Appx. 870, 875 (6th Cir. 2004). Thus, the Court's role is not to second-guess the business judgment of the employer. Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 462 (6th Cir. 2004). The Court is to look at the employer's motivation and not the employee's perception in determining whether discrimination played a part in the decision. See, Burke-Johnson v. Dept. of Veterans Affairs, 2006 WL 3798149 at *8 (6th Cir. 2006). In this case, Plaintiff has offered nothing which would suggest that Martin-Brower's decision to eliminate the maintenance department at the Dickson, Tennessee facility was other than a business judgment.

## B. **RETALIATION**

In order to establish a *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant

thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

In this case, Plaintiff claims retaliation because of Tanley's statement that he was "sick and tired" of Jones' and Plaintiff's ongoing dispute. However, leaving aside the ambiguous nature of the statement (as discussed above), Plaintiff cannot show a causal connection because there is no showing that Tanley made the ultimate decision to eliminate the maintenance department. That decision was made by Egli with approval from the corporate hierarchy.

Plaintiff also claims retaliation because she received less pay than other forklift trainers. Leaving aside that there is no showing Martin-Brower was aware of any such complaint (and thus could not be aware of the alleged protected activity), as has been shown, Martin-Brower has established that the forklift trainers Plaintiff identifies were Warehouse Leads who were subject to a different payscale and had different job responsibilities.

Plaintiff also claims retaliation because of the "scrutiny" she received when she took a personal day after a holiday, while Daniel Maynard received no such scrutiny. She also alleges,

19

more generally, that she was retaliated against because of the delay in payment for that day and because her FMLA leave was not initially approved for the one day.

Leaving aside the fact that the Court has no evidence relating to the circumstances surrounding Maynard's alleged leave situation, Plaintiff has not shown that the short delay in receiving her pay was an adverse employment action. Nor has she shown that the retroactive restoration of a personal day constituted an adverse action.

Under the THRA, an adverse employment action is "a material and adverse change in the terms and conditions of employment." Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 707 (Tenn. 2000). "The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. In Barnes, the Tennessee Supreme Court provided a non-exhaustive list of adverse employment actions including: "termination of employment; demotion evidenced by a decrease in wage or salary, by a less distinguished title, or by a material loss of employment benefits; or a significant reduction of material responsibilities." Id.

Plaintiff cites the Supreme Court's decision in Burlington Northern to support her contention that she suffered an adverse employment action. There, the Supreme Court indicated for there to be an "adverse employment action" it is not necessary that the action be some sort of "ultimate employment decision," such as hiring, granting leave, discharging, or demoting. Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id., 126 S.Ct. at 2415 (citations and quotation marks omitted). The Court went on to note that it was "speaking of material adversity," because it "is important to separate significant from trivial harms." Id

Applying this test to the facts before it, the Supreme Court in <u>Burlington Northern</u> concluded that the plaintiff who was suspended without pay for thirty-seven days had experienced retaliation, because, inter alia, a reasonable worker would be dissuaded from making a discrimination claim when it meant surviving for thirty-seven days without pay and with no way of knowing when or if she would be reinstated. This remained so, even though the employee was eventually reinstated with backpay. <u>Id</u>. at 2417.

The allegations made by Plaintiff in this case hardly rise to this level. The record indicates Plaintiff was never suspended, that she was paid for her time shortly after complaining,[8] and that she was granted her leave time. The Court finds that the short delay in receiving holiday pay and retroactive approval of Plaintiff's request for FMLA leave were not adverse actions because they would not dissuade a reasonable person from making or supporting a complaint of discrimination, especially since Plaintiff admitted that both issues were quickly corrected in her favor and she suffered no loss.

Finally, Plaintiff asserts retaliation because of her termination. While the loss of a job is unquestionably an adverse action, as already explained, Martin-Brower has offered a legitimate non-discriminatory reason for its action which Plaintiff has not shown to be pretextual.

## IV. CONCLUSION

Plaintiff has set forth numerous contentions (many unsupported by the evidence or even her own Affidavit) which she claims shows Martin-Brower engaged in discrimination and retaliation. The mosaic of facts presented by the Plaintiff, however, fails to paint a picture of discrimination

---

[8]The record is unclear as to the exact time frame but it appears that both matters were resolved within days of Martin-Brower becoming aware of the situation.

21

based upon sex or retaliation based upon her engagement in protected activity. Accordingly, Defendant's Motion for Summary Judgment (Docket Entry No. 19) will be granted and this case will be dismissed.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE